**CITY OF HOUSTON, Appellant,**

v.

**Paul H. CAMBEILH, Jr., Appellee.**

**No. 13173.**

Court of Civil Appeals of Texas.

Houston.

Feb. 25, 1960.

Rehearing Denied March 17, 1960.

Geo. D. Neal, former City Atty., Edgar Pfeil, Senior Asst. City Atty., Houston, for appellant.

Scardino & Regnier, Robert A. Scardino, Burns & Grumbles, Houston, for appellee.

BELL, Chief Justice.

Appellee recovered judgment against appellant for $9,355 as damages resulting from injuries received by his wife, Mercedes Cambeilh, when she stepped in a hole in the crosswalk at the intersection of Main and McKinney Streets on September 28, 1953.

Since appellant attacks the verdict of the jury as being without support in the evidence and also as being contrary to the overwhelming weight and preponderance of the evidence, we must give a rather full summary of the evidence.

Mrs. Cambeilh testified that about 4:30 in the afternoon of September 28, 1953, she left Foley's where she had been to return a record and proceeded north along the sidewalk on the west side of Main Street. She stopped at the Lamar Drug Store and then proceeded on north, window shopping as she walked. Foley's is in the second block south on the west side of Main Street from the intersection where the accident occurred. Between 4:30 and 5:00 o'clock when she reached the intersection of McKinney and Main Street on the west side of Main Street she stopped momentarily to al-

low the traffic light to change. When it changed, she proceeded across McKinney in the right-hand portion of the crosswalk. (We might say here that the store of Rolle, Jewett & Beck was located at the southwest of this intersection and Woolworth's store is located at the northwest corner, so that Mrs. Cambeilh was proceeding from the Rolle corner to the Woolworth corner.) There were quite a few people crossing on the crosswalk in front of her, going the way she was, and meeting her. A lot of people always cross there. So many people get off work at 4 and 4:30 in the afternoon that quite a few people were using the crosswalk when she was crossing. There were people all around her in the walk and she didn't look down at the street. When she got about 4 feet, possibly 3½ feet from the north curb line of McKinney, she felt her foot go down and she fell in the street. She stepped in a hole. She couldn't get up and 2 men picked her up and began taking her toward Woolworth's. When they reached the curb she looked back at the hole where she had fallen, though she didn't turn around. She was taken into Woolworth's, where she waited until an ambulance came and took her to the hospital. As she was taken out of the store on a stretcher, she again looked at the hole where she had fallen. The hole was jagged. As she was being carried to the curb, she looked back and said she had stepped in a hole and pointed to the hole. Just then a man walked up behind her and said he stumbled in that same hole and almost fell. When she was being taken to the ambulance she pointed the hole out to the officer there. She did not know the name of the officer. She further described the hole as jagged, oblong or egg-shaped. It was from 7 to 9 inches long and 3 to 5 inches wide. It was not of uniform depth but was from 2 to 3 inches on one side down to about 5 inches on the other. In the claim filed with the City, which was in evidence, she described it as being about 3 inches deep and approximately 9 inches long and 7 inches wide. This was the only hole she saw.

A Mrs. Moore was in Woolworth's when Mrs. Cambeilh was brought in and she remained there until after the ambulance left. After the ambulance took Mrs. Cambeilh away, Mrs. Moore went out to look at the walkway. She saw a hole in the walkway a few feet from the north curb. It was the only hole she saw. She said it was a good big hole, but could not give its dimensions. She did not measure it and said she could not tell the approximate size. That night she called the Mayor to notify him of the presence of the hole, but he was not home, and she told his wife.

Mr. Cambeilh testified he went to the crosswalk where his wife had fallen the next day, that is, September 29. He inspected the crosswalk on McKinney on the west side of Main Street. About 3 or 3½ or 4 feet from the north curb line of McKinney he found a hole. It was somewhat oblong in shape and jagged. It was from 4 to 5½ to 6 inches deep. It was not the same in depth throughout its area. It was 9 or 10 inches long and about 8 or 8½ inches wide. There were several cracks in the street, but just one hole. He did not actually measure the hole.

Mrs. Zweig testified by deposition. She was employed at Woolworth's September 28. The counter where she worked was just inside the door through which she could look and see the walkway across McKinney between Woolworth's and Rolle's. She went to work at Woolworth's August 8, 1953. She was there when Mrs. Cambeilh was brought into the store. From the counter where Mrs. Zweig worked she could see the crosswalk but to see the hole she would have to go near the door. A hole was in the crosswalk before September 28. It had been there for from 4 to 6 weeks. She could not give its dimensions. She stated she had seen a couple of people stumble in the hole prior to September 28. The edges on the hole were ridged. She could not give the width or depth. The hole was big enough for someone to turn their ankle. The hole was about a foot from the curb line near Woolworth's. She

had no way of knowing whether the hole she saw was the one Mrs. Cambeilh fell over.

The above was introduced by the plaintiff before he rested his case. The following evidence was introduced by plaintiff in rebuttal.

Mrs. Thompson, the wife of a U. S. Customs officer, a friend of a cousin of Mrs. Cambeilh, but who did not know Mr. or Mrs. Cambeilh before the accident, testified she went to the crosswalk on McKinney between Rolle's and Woolworth's the first week in October, 1953. She saw a hole that was from 8 to 11 inches long. It was from 7 to 8 inches wide and about 3 inches deep. It was big enough for her to try to put her foot in it. She was with Mrs. Niland. The hole was at the Woolworth corner. It was a jagged hole. About 2 weeks later the hole was still there. The hole was about 3 feet or so from the north curb and about 3 or 4 inches or a foot to the right of the center of the crosswalk going toward Foley's (south). She had heard the hole was in the lane between Woolworth's and Foley's on McKinney. She went down there and looked around and this was the only hole that was there. The witness said the hole shown in the defendant's Exhibits 3 and 7 didn't look as deep as the hole she saw, though it was similar in shape.

Mrs. Niland, a cousin of Mrs. Cambeilh, said she went the first week in October, 1953 with Mrs. Thompson. She went to the crosswalk and saw a hole. She put one of her feet and part of the other in the hole. It was 3 or 4 feet from the Woolworth (north) curb. It was in the crosswalk a little bit off center. The hole was about 11 inches long and about 8 inches wide. It was kind of broken—ragged like—and oval in shape. It was 3 or 4 inches deep. Later they repaired the hole. They repaired it twice. It was repaired 2 or 3 months later. The first time they just repaired the hole. The next time they repaired a whole section. It was repaired

between December 1 and Christmas. In December when they were repairing it, there were 3 or 4 men working and they had to move to let her by. This was the first time they repaired it. About 6 months later they repaired a whole big section. When they first repaired it there were 4 men and they had a little wagon. The hole was just a little to the right of the center of the crosswalk going toward Foley's. The witness was shown defendant's Exhibit 3 and marked X where she saw the repairs being made. The mark is substantially north and west from the hole shown in Exhibit 3. The men had a little place dug out and were putting something in it. She later saw the place and you could tell it had been repaired. On Exhibit 3 she could not see the hole that was repaired.

Mrs. Bennett, a cousin of Mrs. Cambeilh who worked for Cravens, Dargan & Company, an insurance agency, went to the crosswalk 2 or 3 days after the accident. She saw an oval shaped hole in the street. It was irregular in shape. It was about 10 or 12 inches by about 6 to 8 inches. It was not uniform in depth but was about 3 inches deep at one place and ran a little deeper. She went back about 2 weeks later and could see a little dark place. The hole was from 6 to 8 feet from the north curb. It was in the crosswalk where pedestrians normally walk. When she went by several weeks later and saw the dark spot, the hole was no longer there and she assumed it had been filled up. She was shown defendant's Exhibit 3, but said she could not point out where the hole was. She could not tell whether it showed the repair or not. (Exhibit 3 was a shot taken from near the south curb lookingly slightly at a northeast angle across the crosswalk. The height from which taken is not shown.) She could not see the repairs she said had been made. There was only one hole in the crosswalk at the time she first examined it.

Mrs. Dorothy Leonard went to the crosswalk the next morning after the accident. She was a friend of Mrs. Cambeilh. She went for the purpose of looking at the

hole and also went to town to buy a gift for Mrs. Cambeilh. She saw a hole in the crosswalk 3 or 4 feet, or maybe a little farther, from the north curb. It was about in the center of the crosswalk. It was about 9 inches long, or maybe a little bit longer. It was 2 or 3 inches deep, being a little deeper in the center. It was jagged. It was 9 or 10 inches wide. She saw no other hole in the crosswalk that she recalls. She could not see the hole on Exhibit 7 that she had previously described; the hole was bigger than the one shown on this exhibit.

The above is all of the testimony introduced by appellee, including rebuttal.

The appellant offered the following witnesses and the following is a summary of the testimony of each.

Mr. Roger Bennett, a police officer of the City of Houston, worked traffic at Main and McKinney. He identified defendant's Exhibits 2 to 7 as pictures taken of the crosswalk on December 15, 1953. He testified this was quite a busy intersection and pedestrian traffic was heavier on the west side of Main because Woolworth's and Foley's stores were on that side. He stated that thousands of persons used that crosswalk daily, and estimated 10,000 or more. On September 28, 1953 his shift ended at 3 p. m. He first heard of a lady falling about the time the pictures were made. (The claim had been filed with the City December 4.) No repairs had been made at the intersection for 5 or 6 months before December 15, when the pictures were made. On December 15, when the pictures were made, he checked the crosswalk across McKinney on the west side of Main to see if he could find any holes and he found only one small hole and a few cracks that are shown in some of appellant's pictures. He saw the small hole shown on Exhibit 3. It was in the gutter line of Main Street out of the crosswalk and about the center of McKinney. This is the same hole shown on Exhibit 7. This hole was measured and its depth was ½ inch or less. A crack in

the pavement is shown on Exhibits 5 and 6. The weather cracks in the pavement were approximately ¼ inch deep. For the period from April to September 28, 1953, he never saw a hole in the crosswalk 3 inches by 7 inches by 9 inches though he was working traffic during this time at the intersection. He never saw any such hole within 6 months before December 15. It is his duty to report defects in the sidewalk and street. He saw nothing on December 15 showing repair of a hole such as appellee and his witnesses claimed was in the crosswalk.

Mr. Crone, a police officer, was working traffic in the downtown area in September, 1953. He was in an automobile that cruised the downtown section. At the time Mrs. Cambeilh fell he was in the middle of the block west of Main Street. She fell 10 to 12 feet south of the north curb. He knew she fell because he saw some people assisting her to the curb. He did not actually see her fall. The accident occurred at approximately 4:30 in the afternoon. He went to where Mrs. Cambeilh was being helped to the curb. She told him she had fallen in the crosswalk. He didn't think she told him what she stepped in, but he couldn't say. The witness went into Woolworth's and called an ambulance for her. The ambulance came to the Main Street side of Woolworth's. After the ambulance left he checked the crosswalk to see if there was any "dangerous" hole and he didn't find anything that was "dangerous". He continued his assignment in the downtown area about 2 years and he would go across this intersection about twice a day. He cruised in an automobile. He did not see any repairs within 6 months after the accident. On cross-examination, the officer was asked if he found a hole and he answered "nothing that I considered dangerous." On being shown one of defendant's pictures (which one we cannot tell), containing a hole, he said he had no independent recollection of seeing it September 28 but he was sure *he saw it if it was there.*

Mr. O. D. Harris, who had charge of repairs to permanent pavement for the City, testified that he had thoroughly checked his daily records and repairs in the crosswalk were last made before the accident in May of 1953. His records reflect the next repairs were made April 27, 1954. This was to repair a 2 by 5 foot electric cut. These records were kept under his supervision. They consisted of daily sheets that were supposed to be made out by the various foremen and turned in each day by the foremen. The reports were supposed to show where each crew had worked on a given day and the kind and amount of material used.

Mr. Schumacher, a police officer, testified that on September 28, 1953, he was working traffic at Main and McKinney. He worked from 3 p. m. until 11 p. m. He was in the middle of the 1000 block of McKinney writing a traffic ticket when he noticed a crowd in the crosswalk. He did not know how far out from the curb. When he arrived at the crosswalk a police officer was helping a lady. He did not know where she had fallen. There were 2 other people also helping the lady. While Mrs. Cambeilh was in Woolworth's he heard her say she had fallen in a hole in the street. After the ambulance left he and officer Blackstock went to look at the crosswalk. He could not find anything big enough to be called a hole—nothing he would consider dangerous to pedestrians. He was shown one of defendant's exhibits (either 3 or 7) and said he had not seen the hole shown in the picture when he examined the crosswalk September 28. At another place he said he didn't find anything at all.

Mr. Blackstock, a police officer who was working traffic 1 block north of McKinney, said he checked the crosswalk after the ambulance left, and he found no hole that he would consider a danger to pedestrians.

Mr. Burton, Inspector of Police, on December 15, 1953, was Chief Investigator for the City Legal Department. He had charge of the investigation that was made on that date of the crosswalk involved in this case. His testimony corroborated the other officers present thereon that date, that the only hole found was about the middle of McKinney and measured about ½ inch in depth. However, he said the hole was on the east edge of the crosswalk and not outside of it, as one officer had testified. He also corroborated the testimony that there did not appear to be any recent repairs. It was about the middle of McKinney.

■ Appellant contends the trial court erred in not submitting its specially requested Issue No. 1, reading as follows:

"What do you find from a preponderance of the evidence was the depth, length, and width of the hole, if any, inquired about in Special Issues Nos. 1, 2, 3 and 4?"

The court in its charge had asked the jury to find whether there was a hole in the crosswalk which was unsafe to pedestrians using the crosswalk; whether it had been there a sufficient length of time for appellant in the exercise of reasonable diligence to have discovered it and repaired it; whether Mrs. Cambeilh stepped in it, and whether the failure of the City to repair it was negligence. Appellant's theory is that if the hole shown in the pictures taken by the City on December 15 was the hole Mrs. Cambeilh stepped in (and they urged the evidence shows this is the only one that could have been there), there was no liability as a matter of law because actual measurements showed the hole to be only ½ inch deep. It urges the jury could have believed this was the hole she stepped in and yet have concluded it, regardless of depth, made the crosswalk unsafe to pedestrians. In such case it argues that as a matter of law there is no liability.

Appellant relies upon the cases of City of Waco v. Stinnett, Tex.Civ.App., 177 S.W. 2d 323, affirmed 142 Tex. 648, 180 S.W.2d 433; City of Galveston v. Dazet, Tex., 19 S.W. 142, and City of San Antonio v. Chabot, Tex.Civ.App., 318 S.W.2d 485,

n. r. e. The appellant says these authorities establish that as a matter of law a hole ½ inch in depth cannot create a condition that the City can reasonably foresee will be a danger.

We find it unnecessary to decide whether under all circumstances presented in this case there would be a fact issue of negligence if there was evidence Mrs. Cambeilh had fallen in the hole ½ inch deep, 4 inches wide and 16 inches long shown in appellant's Exhibits 3 and 7, and thus expressly refrain from expressing any opinion.

We hold there was no evidence of probative force tending to establish that hole in the crosswalk as shown in these exhibits was there on September 28 when Mrs. Cambeilh fell and was injured. The pictures showing this hole were taken December 15, 1953. No one testified that this hole was there September 28. No witness of the appellant even testified it was there. As we recall, the only witnesses of appellant, who were specially asked about such hole being there when they inspected the crosswalk in September, failed to testify it was there. One officer said he did not see it there. One officer said he had no independent recollection of seeing it there, but if it was there he saw it. Two officers did testify they saw nothing in the crosswalk they considered dangerous, but they did not describe the dimensions or location of any such defect they were referring to. They never testified to the presence of any such hole on September 28 as shown in appellant's exhibits.

In addition to the testimony of appellant's own witnesses, appellee's witnesses testified there was only one hole in the crosswalk when they inspected the crosswalk, and the hole was not ½ inch deep but from 2 to 6 inches deep and located from 1 to 5 feet from the north curb of McKinney and near the center of the crosswalk looking from east to west. The ½-inch hole shown to have been there on December 15, nearly 3 months after the accident, was under appellant's own witnesses about the center of McKinney, a very substantial distance from

where Mrs. Cambeilh says she fell and where all of her witnesses placed the only hole they found. Too, one of appellant's own witnesses put the ½-inch hole in Main Street in the gutter, though another put it in the extreme east edge of the crosswalk.

Appellant apparently urges that the additional testimony that the records testified to by Mr. Harris, showing no repairs, and various officers' testimony that there had been no repairs made, between May, 1953 and April, 1954, are items of value to establish the ½-inch hole must have been there September 28. We think such testimony has no such tendency. Its only effect would be to evidence that since no repairs were in evidence, the hole upon which appellee predicated liability did not exist. The same is to be said of the pictures taken as they relate to whether repairs are shown or not. We might here note that appellant's Exhibit 5 definitely evidences what can be considered a repair of a hole in the approximate location where Mrs. Cambeilh said she fell, and of the approximate shape described.

The issue in this regard, under the evidence in this case, was whether there was a hole in the crosswalk on September 28, 1953, which was unsafe to pedestrians. If there was such a hole shown to be there on that date of the description testified to by any of the witnesses in this case, there was a fact issue and the particular dimensions did not matter, because if the hole was as much as 2 inches deep, 4 inches wide and 7 inches long, which were the minimum measurements given by any witness, it could not be said as a matter of law under all facts and circumstances here present that the City could not reasonably foresee that a pedestrian might be injured. The court correctly submitted Special Issue No. 1 and correctly refused to submit the requested Issue. City of Winters v. Bethune, Tex. Civ.App., 111 S.W.2d 797, error dism.

Appellant next contends that there was no evidence of actionable negligence because (1) the City could not foresee such an acci-

dent as here involved and the resulting injury, and (2) there was no evidence that the hole had existed for such length of time that the City in the exercise of reasonable diligence could have discovered and repaired it. It also contends that even if there was some evidence that the hole had existed for such length of time that the City could have discovered and repaired it, the court erred in overruling its motion for new trial because the jury's affirmative finding in this regard was contrary to the overwhelming weight and preponderance of the evidence.

■ In determining whether there was evidence that called for the submission of the case to the jury, we must view the evidence most favorably from the standpoint of the prevailing party and if from the evidence and reasonable inferences to be drawn therefrom reasonable minds might differ as to the existence of the ultimate facts, a case for the jury is presented. Renfro Drug Co. v. Lewis, 149 Tex. 507, 235 S.W.2d 609, 23 A.L.R.2d 1114; King v. King, 150 Tex. 662, 244 S.W.2d 660.

■ We hold there was evidence of probative force going to establish that the City could reasonably foresee that a pedestrian using the crosswalk might be injured. As we have above held, we think there is no evidence of probative force going to establish there was any hole in the crosswalk on September 28, 1953, the date of the injury, other than the one in which Mrs. Cambeilh says she fell. On this issue of foreseeability appellant relies upon the assumption that Mrs. Cambeilh fell in the ½-inch hole. We think we have adequately disposed of this assumption by the above discussion.

We have, therefore, evidence of probative value only as it relates to the hole Mrs. Cambeilh says she fell in. It was, as we have noted, described variously by appellee's witnesses. They all put it from 1 to 5 feet from the north curb of McKinney, just a little off of the center of the walkway. There is evidence of probative

value that the hole Mrs. Cambeilh fell in was the one appellee's witnesses saw and were describing, because each of them said it was the only hole they found in the crosswalk; they all examined the crosswalk within a week of the accident and they gave substantially the same location as Mrs. Cambeilh. Mrs. Cambeilh's testimony alone raised the issue of the presence of the hole. Without specifying which witness testified to specific dimensions, it is sufficient to say the shallowest any witness placed it was 2 inches deep. The narrowest any witness put it was 4 inches wide. The shortest any witness put it was 7 inches long. In addition to a hole of at least these dimensions, it was located, or so it could be reasonably found, near the center of a very heavily traveled pedestrian crosswalk. Some evidence shows that 10,000 persons or more used it daily. At some hours, particularly when people get off from work to go home, the intersection is so crowded with pedestrians using it that one cannot look to the pavement, but must look ahead to avoid colliding with other pedestrians. Pedestrians walking in different directions use the crosswalk. Women shopping use it very extensively. Mrs. Cambeilh was wearing high or medium-heeled shoes, as women generally do. These heels could easily catch in a hole such as proof evidences.

■ In City of Waco v. Stinnett, 142 Tex. 648, 180 S.W.2d 433, our Supreme Court said that the depth or height of a defect in the sidewalk could not of itself be controlling. It is only one element to be considered along with all facts and circumstances in determining the liability of a municipality.

Applying this rule, we hold there was evidence of probative force under all the facts tending to establish that appellant could reasonably foresee that a pedestrian using the crosswalk would be injured.

■ Appellant says there was no evidence the hole had been there for such

time that the City could have found it and repaired it. Mrs. Zweig testified as did other witnesses, that on September 28 there was only one hole in the crosswalk. True she did not put it 3½ or 4 feet from the north curb, as did most other witnesses, but put it about 1 foot. However we consider this an immaterial variance in the light of all testimony, because it is a matter of common knowledge that differences of depth perception cause differences of estimates of distances. Mrs. Zweig testified the only hole there had been there from 4 to 6 weeks. Reasonable minds could readily draw the inference that this was the hole Mrs. Cambeilh fell in because there was much evidence showing it was the only hole there. Certainly reasonable minds could conclude the City in the exercise of reasonable diligence could have discovered it in time to repair it. There were police officers present working traffic each day at the intersection, whose duties required them to look for and report such defects.

■ In determining whether the jury's finding that the hole had been there a sufficient length of time to be discovered and repaired by the City was so against the overwhelming weight and preponderance of the evidence as to be clearly wrong, we must consider all of the evidence in the record. King v. King, supra.

■ We have made a pretty full analysis of the evidence already, and find that we cannot say that the jury's finding in this regard is so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong. We would only add the observation that the records are not controlling. They are no better than the diligence and accuracy of those who make them. Too, pictures can play tricks. What they reflect depends on lighting, angles of elevation and angles of direction. Actually, however, we, in examining Exhibits 5 and 7, detect a dark spot that might well be considered a repair in

the location of the hole described by appellee and his witnesses. This is particularly true of Exhibit No. 5.

We overrule appellant's contention that Mrs. Cambeilh was guilty of contributory negligence, as a matter of law, in not keeping a proper lookout. We think the above analysis of the evidence demonstrates that reasonable minds could conclude on a basis of the evidence that she was keeping a proper lookout.

■ Appellant further contends the trial court should not have allowed certain witnesses to testify because they were not listed by appellee on the claim filed with the City when the City charter requires this. Too, appellant contends this omission of the witnesses' names as a matter of law precludes recovery.

We have, because of appellant's earnest and lengthy briefing of this question, read and reread the testimony bearing on the question of whether appellee or his wife knew of the witnesses before they filed the claim. All witnesses testifying on this matter establish appellee and his wife did not know of said witnesses' knowing anything about the case, with the possible exception of Mrs. Niland, who at one point testified she told Mrs. Cambeilh before she left the hospital, which was before the claim was filed. Later Mrs. Niland said she didn't understand appellant's counsel's question and that it was in December, sometime before Christmas, that she told Mrs. Cambeilh about having checked the crosswalk. In any event, the trial court will be presumed to have found the Cambeilhs didn't know of such witnesses because the evidence supports such a conclusion. If they didn't know of the witnesses, they couldn't list them.

Without further analysis of the evidence, we overrule appellant's Points 14–19, which complain of the trial court's refusal to grant a new trial because the jury's answers to Issues 1–5 and its verdict gen-

erally were so against the overwhelming weight and preponderance of the evidence as to be clearly wrong.

Appellant contends the jury's answer to the damage issue is so contrary to the overwhelming weight and preponderance of the evidence as to be manifestly wrong and unjust. We treat this point, in the light of the argument made thereunder, as an assertion that the verdict is excessive.

The evidence shows Mrs. Cambeilh received a broken left hip in the accident. She testified after she fell she could not get up. She was in terrible pain. Another witness who saw her in Woolworth's testified Mrs. Cambeilh was in agony. She was taken to the hospital. While she was waiting for the doctor she was in excruciating pain. She was operated on. She remained in the hospital a little over 2 weeks. After going home she was confined to her bed another 2 weeks. She couldn't sleep at night because of the pain. After this she was able to be in a wheel chair for an hour in the morning and an hour in the evening. She had to hire someone to do the housework until about July, 1954. She was not able to stay up all morning until about Christmas, 1953. After ceasing to use the wheel chair she used two crutches until May or June, 1954. She continued to use one crutch and a walking cane until August. After discarding the crutches and cane, she limped for 2 or 3 months, and limped some at the time of the second trial in 1957 when she was tired or walked much. She favored her left hip so much she now has trouble with her right hip. Before her accident she was in excellent health. For 2 years after the accident she was very nervous, whereas she had not been prior to the accident. At the time of trial in 1957 she was much better. While in the hospital she had to take medication for pain. This continued for several months after she went home. The cost of help about the house was $21 per week for about 6 months.

The only real complaint made as to the amount of damages is with regard to $5,000 allowed for mental anguish. Appellant urges the evidence shows normal recovery with no complications. However, the injury was certainly not a minor one. It was painful and incapacity resulted for several months. It is a matter of common knowledge that any injury such as this can present complications. Looking back, we see no complications. But before recovery anxiety and concern naturally flow from an injury of this nature. We cannot say under all facts and circumstances that the verdict was excessive.

Appellant complains the court erred in overruling its objection that Special Issue No. 2 was duplicitous because it asked the jury if the hole had been there long enough to have been discovered *and* repaired by the City. We find no duplicity in the issue. The ultimate issue is whether the City, in the exercise of reasonable diligence, could have discovered the hole in time to repair it prior to September 28. There is only one ultimate issue but it involves more than one subsidiary fact. In such case the subsidiary facts may be grouped. 41–B Tex.Jur., § 455.

Appellant urges that the trial court erred in allowing Mrs. Cambeilh to testify that a man walked up behind her just as she had reached the curb and said, "I almost—I stumbled and almost went down in that hole you just stepped in." Objection was that it was hearsay and the man was not subject to cross-examination. The evidence was admitted as being res gestae.

Certainly that part of the statement that evidences Mrs. Cambeilh had *just fallen in a hole was admissible as res gestae*. The part of the statement relating that the man had stumbled and almost fallen may have been a narrative of a remote occurrence, or it is susceptible to the construction that he had just experienced

it. If it was a mere narrative of a remote occurrence, it was inadmissible. However, the objection was to the whole of the statement. Where a part of the statement is admissible and part is inadmissible and the court admits the statement, it devolves upon the complaining party to object specifically to' the objectionable part.

We have thoroughly considered all points raised by appellant and though some are not specifically discussed, we overrule them, finding them to be without merit.

The judgment of the trial court is affirmed.